THE COLLINS LAW FIRM
JOHN A. SOPUCH III    #8312
1717 Park Street, Suite 200
Naperville, IL 60563
Email: jsopuch@collinslaw.com
Telephone: (630) 527-1595
Facsimile: (630) 527-1193

CARTER SCHOLER ARNETT HAMADA
   & MOCKLER, PLLC
J. ROBERT ARNETT II #4191
8150 N. Central Expressway, 5th Floor
Dallas, TX 75206
Email: barnett@carterscholer.com
Telephone: (214) 550-8188
Facsimile: (214) 550-8185

Attorneys for Plaintiffs JEREMY GREEN and SHIZUKO GREEN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JEREMY GREEN and SHIZUKO GREEN,<br><br>  Plaintiffs,<br><br>vs.<br><br>SIDNEY K. KANAZAWA, ESQ., a resident of California, and MCGUIREWOODS, LLP, a Virginia limited liability partnership, and DOE DEFENDANTS 1-50,<br><br>  Defendants. | CIVIL NO: 1:16-CV-000054<br><br>COMPLAINT; DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiffs Jeremy Green and Shizuko Green (hereinafter "Plaintiffs"), allege as follows as their Complaint against the above named Defendants.

## PRELIMINARY STATEMENT

Defendants were the lawyers for Plaintiffs. While Defendants represented Plaintiffs and shortly after they terminated their representation of Plaintiffs, Defendants obtained two releases from Plaintiffs. The releases that Defendants obtained from Plaintiffs concerned valuable legal claims that Plaintiffs had against Centex Homes ("Centex"), the company that had, in 2008, sold Plaintiffs a condominium at the Beach Villas at Ko Olina ("BVKO") for $899,000. The claims that Plaintiffs had against Centex were worth hundreds of thousands of dollars, and Defendants knew that. However, despite such knowledge, Defendants advised Plaintiffs to sign documents which released Plaintiffs' valuable claims against Centex without ever explaining to them what their claims against Centex were or the value of those claims. And, at no time, did Defendants explain to Plaintiffs that they (Defendants) were being paid by Centex for obtaining releases in Centex's favor. In return for the releases Defendants obtained from Plaintiffs, Plaintiffs received essentially nothing. Defendants' legal malpractice, as set forth herein, is manifest. Plaintiffs are entitled to significant compensation for Defendants' manifest legal malpractice.

## **PARTIES**

1. Plaintiffs are citizens of Australia and current residents of Singapore.

2. Plaintiffs purchased Unit No. O-425 at BVKO from Centex in 2008. They currently own that unit.

3. Defendant Sidney Kanazawa ("Kanazawa") is a lawyer who is, and was at the time of the allegations set forth herein, licensed to practice law in the State of Hawai'i.  Mr. Kanazawa is a resident of the State of California.

4. Defendant McGuireWoods, LLP ("McGuireWoods") is a law firm with offices in Atlanta, Austin, Baltimore, Brussels, Charlotte, Charlottesville, Chicago, Dallas, Houston, Jacksonville, London, Los Angeles, New York, Norfolk, Pittsburgh, Raleigh, Richmond, Tysons Corner, Washington, D.C. and Wilmington.  At the time of the allegations set forth herein, Kanazawa was a partner at McGuireWoods.  Because it is a partnership, McGuireWoods is a resident of every State in which its partners are residents.

5. Doe Defendants 1-50 are persons, partnerships, associations, companies, corporations or entities whose names, identities, capacities, activities and/or responsibilities are currently unknown to Plaintiffs or their attorneys except that Doe Defendants 1-50 were and/or are subsidiaries, servants and/or employees, representatives, co-venturers, associates, consultants, owners, lessees, lessors, guarantors, assignees, assignors, licensees, and/or licensors of Defendants and

were or are in some manner presently unknown to Plaintiffs or their attorneys engaged or involved in the activities alleged herein or responsible for the activities of which Plaintiffs complain, or should be subject to the relief that Plaintiffs seek. Plaintiffs pray for leave to certify the true names, identities, capacities, activities and/or responsibilities of Doe Defendants 1-50 when, through discovery in this case, the same are ascertained.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. This Court has personal jurisdiction over Defendants because, at the pertinent time of the allegations set forth herein, they were conducting business in the State of Hawai`i and committed acts in the State of Hawai`i giving rise to Plaintiffs' causes of action.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' causes of action occurred in the City and County of Honolulu.

## **STATEMENT OF FACTS**

**A.     Defendants Represented Plaintiffs**.

9.     Before February 9, 2010, Defendants began to represent Plaintiffs as their lawyers. Defendants' representation of Plaintiffs continued until at least December 6, 2012 when Defendants notified Plaintiffs in a letter that Defendants were "clos[ing]" their representation of Plaintiffs.

10.     During the time that Defendants represented Plaintiffs, an attorney-client relationship existed between Defendants, on the one hand, and Plaintiffs, on the other hand.

11.     During the time that Defendants represented Plaintiffs, Defendants owed Plaintiffs a fiduciary duty. Thereafter, Defendants owed Plaintiffs fiduciary and ethical duties by virtue of, inter alia, The Rules of Professional Conduct.

12.     The internal client matter number that Defendants assigned to their representation of Plaintiffs was 2056745-0001.[1] The purpose of the internal client matter number was, among other things, so that Defendants could keep track of the amount of time that was billed to a particular client representation and so that there would be a record generally describing the services performed by Defendants and on what day those services were performed.

---

[1] Plaintiffs were not the only clients that Defendants represented in client matter number 2056745-0001. Along with Plaintiffs, there were the owners of 87 other BVKO units who were jointly-represented by Defendants in client matter number 2056745-0001.

5

**B.    The Scope Of Defendants' Representation Of Plaintiffs Included An Analysis And Determination Of Claims That Plaintiffs Had Against Centex.  That Analysis And Determination Was Never Shared With Plaintiffs.**

13.    The subject and scope of Defendants' representation of Plaintiffs (i.e., client matter number 2056745-0001) included, inter alia, Plaintiffs' purchase from Centex of their condominium unit at the BVKO.

14.    Defendants' representation of Plaintiffs related to the Plaintiffs' use of, and control over, amenities located at BVKO.  At the time that Plaintiffs purchased their BKVO unit, Centex, the developer of BVKO, had misrepresented to Plaintiffs (and many other BVKO purchasers) that they would always be able to use the amenities.

15.    Unbeknownst to Plaintiffs at the time they purchased their BVKO unit, Centex had agreed to sell the amenities to a third-party located in Honolulu, i.e., Ko Olina Development LLC ("KOD"), but had failed to put any protections in place which would have made sure that, if and when KOD bought the amenities from Centex, Plaintiffs would always be able to use the amenities just as they had when Centex owned the amenities.

16.    Defendants' engagement or retainer letter for client matter number 2056745-0001 describes what their representation would entail.  That letter states that Defendants' representation (i.e., client matter number 2056745-0001) would initially cost approximately $60,000 and involve, among other things: (1) a

"review" of the Sale Contracts which were pertinent to Plaintiffs' ownership of their BVKO unit and the amenities at BVKO—these Sales Contracts stated that only Hawai'i law was to apply and govern in any and all disputes between Plaintiffs and Centex; (2) "interviews with clients regarding the current status of" the matter "and the current status of the documents"; (3) determining "the limits, if any, on [Plaintiffs'] ability to have [their] dispute [with Centex] resolved by a court or a jury rather than in arbitration"; (4) "research…focused on developing either grounds for fraud [by Centex] in the original sale of the residential units and/or developing conceptual fair dealing duties of [Centex] to" Plaintiffs; (5) the preparation of "position papers and meetings to persuade the developer [Centex] and others to provide protections for" Plaintiffs.

17.   Defendants' engagement or retainer letter also stated that, "In the event that this matter cannot be settled" and "proceed[s] to litigation in the courts or in arbitration", Defendants anticipated that they would need to do the following, among other things:  (1) "Prepar[ing]…a complaint against [Centex]"; (2) "Respon[ding] to initial motions; and (3) "extensive discovery."  To handle that extensive discovery, Defendants' engagement or retainer letter represented that they (Defendants) "will be retaining local [Hawaii] counsel to conduct most of this discovery."  Defendants' engagement or retainer letter also explained that, should a

trial or arbitration against Centex be required, Defendants expected such a proceeding to last "20" days.

18. Defendants' billing records in client matter number 2056745-0001 also provide a description of what they were doing as part of their representation of Plaintiffs. Those records show that, as part of their representation of Plaintiffs, Defendants, among many other things: (1) conducted legal research regarding Hawaii's consumer protection statutes to determine if Centex had violated such statutes; (2) reviewed and analyzed case law related to those Hawaii statutes; (3) conducted legal research regarding Hawaii's unfair practices statute to determine whether Centex had violated that statute; (4) drafted memoranda regarding the rights that Plaintiffs had against Centex; (5) prepared an analysis regarding the rescission rights that Plaintiffs had against Centex; and (6) "review[ed] law regarding causes of action [against Centex] and [the Hawaii] statutes of limitations' for those causes of action."

19. Other documents prepared by Defendants while they were representing Plaintiffs in client matter number 2056745-0001 also show that the scope of Defendants' representation specifically included determining whether Plaintiffs had viable claims against Centex for making "false and misleading" statements at the time Plaintiffs bought their unit from Centex in 2008 regarding the BVKO owners' use and control of the BVKO amenities.

20. These other documents prepared by Defendants show that the scope of Defendants' representation of Plaintiffs in client matter number 2056745-0001 also involved an analysis regarding whether they had claims against Centex based on various Hawaii statutes, including Hawaii Revised Statutes §§ 514B-67, 514B-94, 480-2 and 480-13.

21. These documents prepared by Defendants also show that Defendants concluded that the remedies available to Plaintiffs may include "Rescission", "Damages", "Treble Damages" and "Attorneys Fees."

22. As part of their representation of Plaintiffs and in order to preserve and safeguard all of legal claims that they had against Centex, in August 2009, Defendants drafted a Standstill and Tolling Agreement ("STA") and were able to convince Centex to sign it. The STA made sure that the statute of limitations on "any and all claims or causes of action for damages of any scope and description inclusive of but not limited to resultant damages and/or punitive damages, whether at law or in equity, known or unknown, past, present or future, contingent or uncertain, of whatsoever nature, arising, arisen, growing out of, connected with or in any manner involving, concerning or relating to or arising out of the purchase by a Homeowner of any unit in the Project or related or arising out of Centex's creation, management and/or administration of the Project, inclusive of any act, omission, duty, obligation, agreement, representation of Centex or anything

whatsoever with regard to any allegations of mischaracterization, misrepresentation, nondisclosure or rescission of the Homeowners' purchase contracts with Centex for residential apartments in the Project; or arising out of any obligation of good faith and fair dealing in favor of the other" were tolled while Defendants and Centex tried to work out a settlement.

C.     **Defendants Obtain First Release From Plaintiffs in February 2010.**

23.    In early 2010, Defendants advised Plaintiffs to allow Defendant Kanazawa to enter into a settlement on their behalf with Centex. The settlement contained a release of all of the claims that Plaintiffs had against Centex, except construction defect claims

24.    Defendants never explained to Plaintiffs what the claims were against Centex that they would be releasing.

25.    Defendants never explained to Plaintiffs the value of the claims against Centex that they would be releasing.

26.    In a January 30, 2010 e-mail, Defendant Kanazawa wrote "Dear Clients, Attached is a power of attorney for your signature. By signing this document you are giving me the authority to sign a settlement agreement on your behalf with the provisions indicated and you will be bound to the terms of that agreement….I recommend settlement under these terms."

27. Defendant Kanazawa's January 30, 2010 e-mail then went on to explain to Defendants' "Clients", including Plaintiffs, that "**The most critical feature of the [settlement] agreement** [that he was recommending they give him authority to enter into] **is that you are agreeing to not sue and agreeing to waive your rights against Centex….**"

28. Kanazawa never explained to Plaintiffs what their "rights against Centex" were that they would be waiving.

29. Based on Kanazawa's advice, Plaintiffs entered into the settlement.

30. Had Kanazawa explained to Plaintiffs what their rights against Centex were, they would have not entered into the settlement.

31. The Settlement and Release Agreement was dated and effective on February 9, 2010 (the "February 2010 Settlement"). Defendants, however, never provided Plaintiffs or any of their other jointly represented clients a copy of the February 2010 Settlement before it became effective.

32. In a February 9, 2010 e-mail (i.e., the effective date of the February 2010 Settlement) clients, Defendant Kanazawa explained why none of his clients would be allowed to see the February 2010 Settlement that he was entering into on their behalf with Centex. Specifically, Kanazawa explained: "Dear Clients…I have not been able to provide you with a copy of the [February 2010 Settlement]

11

b/c Centex wants to preserve its attorney work product and attorney client privileges with respect to any drafts of the settlement agreement…."

33. Defendant Kanazawa never explained how Centex could maintain such claimed "privileges" over the draft settlement even though he and Centex had been exchanging drafts of the agreement.

34. For its part of the February 2010 Settlement, Centex agreed to take certain steps, including continuing its ongoing efforts in a Hawai'i federal lawsuit in which it was involved, to try and retain control and use of the amenities that it had promised to Plaintiffs when they bought their BVKO unit.

35. For the next two years, Defendants continued their representation of Plaintiffs and of their other jointly-represented clients in client matter number 2056745-0001 to ensure that Centex complied with the terms of the February 2010 Settlement and followed through with the Hawai'i federal litigation.

36. Plaintiffs received no money in return for the release that they gave to Centex based on Kanazawa's advice.

37. The claims that Plaintiffs had against Centex and released based on Kanazawa's advice were worth hundreds of thousands of dollars at the time that those claims were released.

**D.    Defendants Terminate Their Representation Of Plaintiffs And Go To Work On Behalf of Centex.**

38.   On December 6, 2012, Defendants informed Plaintiffs by letter that they (Defendants) were terminating their representation of Plaintiffs. In the letter, Kanazawa wrote: "Dear Clients…. Because the settlement with Centex has concluded and the recent decision of the Ninth Circuit has affirmed the recharacterization, it is time for me to formally conclude my representation of you and thank you for allowing me to represent you in this matter."

39.   In December 2010, nearly 2 years before Defendants terminated their representation of Plaintiffs in client matter number 2056745-0001, Centex sold -- for one dollar ($1) -- the BVKO amenities to KOD.  Upon purchasing the amenities from Centex for $1, KOD, as was its absolute legal right, in February 2011, padlocked the BVKO amenities, excluding Plaintiffs from being able to use the amenities.

40.   At the time that KOD locked Plaintiffs out of the amenities, Defendants owed Plaintiffs a fiduciary duty and an attorney-client relationship existed between Defendants, on the one hand, and Plaintiffs, on the other hand.

41.   After KOD locked out Plaintiffs from the amenities in February 2011 and before December 6, 2012 when they terminated their representation of Plaintiffs, Defendants concluded that Plaintiffs had a breach of contract claim against Centex based on KOD's actions in locking up the amenities.

42. While they represented Plaintiffs, Defendants knew that Plaintiffs' breach of contract claim against Centex based on KOD's actions in locking Plaintiff out of the amenities was worth hundreds of thousands of dollars.

43. Defendant Kanazawa himself has stated under oath that the breach of contract claim that Plaintiffs had against Centex based on the lockout by KOD had **not** been released by The February 2010 settlement. Specifically, Defendant Kanazawa stated under oath that the claims released by The February 2010 Settlement "**are limited to** the claims that existed up until February 9 of 2010…" and that "**[T]his [February 2010 Settlement] Agreement has nothing to do with the claims regarding the lockout.**"

44. Despite representing Plaintiffs at the time of the KOD lockout and for 22 months thereafter, at no time did Defendants ever advise Plaintiffs that they had a breach of contract against Centex based on the KOD lockout.

45. At no time did Defendants ever advise Plaintiffs that they could indeed sue Centex because the KOD lockout gave rise to a breach of contract claim that had not been released by way of the February 2010 Settlement.

46. At no time did Defendants ever advise Plaintiffs that the release in the February 2010 Settlement Agreement did not cover claims against Centex based on the KOD lockout.

47. Had Defendants informed Plaintiffs that they had a breach of contract against Centex based on the KOD lockout, Plaintiffs would have pursued that claim.

48. Had Plaintiffs pursued that claim, Plaintiffs would have prevailed against Centex on that claim just as more than twenty (25) other BVKO owners had done.

E. **Defendants Secretly Work With Centex To Extinguish Plaintiffs' Claims.**

49. No later than October of 2012 **and while Defendants were still representing Plaintiffs in client matter number 2056745-0001**, Defendant Kanazawa contacted Centex. At that time, Defendant Kanazawa explained to Centex what he never explained to Plaintiffs, i.e., that all of his clients, which specifically included Plaintiffs, had new (and unreleased) claims against Centex based on the KOD lockout.

50. Kanazawa told Centex that its exposure from his clients' breach of contract claims based on the KOD lock-out well exceeded $100 million. Kanazawa, however, never told Plaintiffs that they had a breach of contract claim, let alone what their breach of contract claim against Centex was worth.

51. Defendants never told Plaintiffs that their breach of contract claim entitled them to, among other things, force Centex to buy back their unit for significantly more than the $899,00 that they had paid for it in 2008.

52. In a July 5, 2013 e-mail to Centex's General Counsel, Kanazawa explained to Centex that he had developed a plan, the "essence" of which was to eliminate, in Centex's favor and for pennies on the dollar, all of his clients' breach of contract claims against Centex based on the KOD lockout. The "goals of [Kanazawa's] proposal", Kanazawa wrote to Centex's General Counsel, was: "Number 1, to curtail Centex's litigation exposure – both in terms of individual unit liability [i.e., to his own clients] and long-term continuing defense of arbitrations…."

53. Kanazawa never informed Plaintiffs about his July 5, 2013 e-mail.

54. Kanazawa never provided Plaintiffs with a copy of his July 5, 2013 e-mail.

55. At no time did Defendants seek permission from Plaintiffs, or even inform them, that Kanazawa was now advising Centex on how to "curtail Centex's litigation exposure" based on the KOD lockout. Plaintiffs had no idea that their lawyer was assisting Centex in curtailing its litigation exposure against them.

56. Defendants' work in assisting Centex to curtail its litigation exposure to Plaintiffs was substantially related, if not identical, to Defendants' representation of Plaintiffs in client matter number 2056745-0001. Indeed the goal of Defendants was identical in both their representation of Plaintiffs and the other

16

owners and their work assisting Centex. That goal was to obtain from Plaintiffs releases of their claims against Centex.

57. Defendants worked with Centex to prepare a Settlement and Release Agreement; Joinder by the AOAO document ("the July 2013 Settlement"), pursuant to which "Homeowners" who signed the document released all "Covered Claims" against Centex. The release that Defendants and Centex drafted eliminated every claim that Plaintiffs had against Centex based on the KOD lockout, i.e., claims that Plaintiffs never knew that they had. For its part, Centex agreed to pay up to $15 million for the benefit of the Homeowners.

58. Plaintiffs did not know that Defendants were involved in the July 2013 Settlement.

59. At the direction of Defendants, the BVKO AOAO aggressively campaigned to obtain as many signatures of as many Homeowners as possible to the July 2013 Settlement. Plaintiffs entered into the July of 2013 Settlement.

60. At no time, did Defendants explain to Plaintiffs that "**The most critical feature of the [The February 2010 Settlement]**", i.e., that Plaintiff had **"agree[d]to not sue and agree[d] to waive [their] rights against Centex…."** was no longer applicable, and that Plaintiffs could indeed sue Centex based on the KOD lock-out and indeed had new rights against Centex which had not been waived by the previous settlement.

17

61. With the assistance and guidance of Defendants, Centex successfully eliminated well over $100 million in liability to Defendants' clients in client matter number 2056745-0001 for just $15 million.

## CAUSES OF ACTION

**Count One: Legal Malpractice**

62. Plaintiffs repeat and incorporates by reference their allegations in paragraphs 1 through 61 of the Complaint.

63. Plaintiffs, on the one hand, and Defendants Kanazawa and McGuireWoods, on the other hand, had an attorney-client relationship.

64. Defendants Kanazawa and McGuireWoods owed Plaintiffs a duty to use such skill, prudence, and diligence as lawyers in the State of Hawai'i of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake.

65. As set forth herein, Defendants Kanazawa and McGuireWoods breached their duty to Plaintiffs by, among other things, failing to advise Plaintiffs that they had valuable claims against Centex and by, unbeknownst to Plaintiffs, advising and assisting Centex in eliminating Plaintiffs' valuable claims for much less than Defendants knew Plaintiffs' claims were worth.

66. There is a causal connection between the breaches of duty by Defendants Kanazawa and McGuireWoods and Plaintiffs' injuries.

67. Plaintiffs suffered actual loss or damages as a result.

**Count Two:  Breach of Fiduciary Duty**

68. Plaintiffs repeat and incorporate by reference their allegations in paragraphs 1 through 67 of the Complaint.

69. As Plaintiffs' attorneys, Defendants Kanazawa and McGuireWoods, owed Plaintiffs fiduciary duties.

70. Defendants Kanazawa and McGuireWoods breached their fiduciary duties to Plaintiffs by, among other things, failing to advise Plaintiffs that they had valuable claims against Centex and by instead, unbeknownst to Plaintiffs, advising and assisting Centex in eliminating Plaintiffs' valuable claims for much less than Defendants knew Plaintiffs' claims were worth.

71. Defendants Kanazawa's and McGuireWoods' breaches of fiduciary duties proximately caused injury to Plaintiffs.

72. Plaintiffs suffered actual loss or damages as a result.

WHEREFORE, Plaintiffs pray for relief as follows:

A. For damages against the Defendants in an amount to be determined at trial;

B. For punitive damages in an amount to be determined at trial;

C. For reimbursement of costs and expenses, including their reasonable attorneys' fees;

D. For prejudgment and post-judgment interest at the highest rates permitted by law; and

E. For such further and additional relief as the Court finds just and equitable.

DATED: Honolulu, Hawai'i, February 8, 2016

                */s/ J. Robert Arnett II*
                JOHN A. SOPUCH III
                J. ROBERT ARNETT II
                Attorneys for Plaintiffs JEREMY GREEN
                AND SHIZUKO GREEN